## REPRESENTATIONS TO MORTGAGEE AS TO THE VALUE OF PROPERTY.

[Circuit Court of Lucas County.]

GEORGE H. McMULLEN, RECEIVER, v. BRITTON W. GRIGGS ET AL.

Decided, February 7, 1902.

*Mortgage—Representation by Mortgagor—As to Value and as to Title —Agency—Liens of Mechanics and Material Men—Interest Thereon.*

1. The rule applies to real as well as to personal property that a statement by the seller or mortgagor exaggerating the value of the property is not a fraudulent representation, or one that will avoid the contract, where the purchaser has full opportunity to examine the property and is competent to judge of its value.
2. A representation by a mortgagor that he is the sole owner of the property upon which he is contracting the loan, whereas in fact he is the legal owner with an equitable interest outstanding upon which the holder asserts no claim, is not such a false representation as to title as to relieve the mortgagee from advancing the full amount stipulated in the mortgage contract.
3. The representative of a mortgage loan company who has authority to solicit subscriptions to its capital stock, collect dues and fines, solicit loans and cause property to be appraised upon which loans are to be made, is an agent of the loan company, notwithstanding his compensation is derived from commissions paid by those borrowing money from the company.
4. In decreeing that a loan company shall advance the balance due under the mortgage contract for the payment of liens of mechanics and material men, interest will be allowed on the liens from the date of the completion of the mortgaged premises, less arrearages due to the loan company.

HULL, J.; PARKER, J., and HAYNES, J., concur.

Heard on appeal.

This action grew out of the building of a certain building in the city of Toledo, and the loan that was made to the owner of the building by The Southern Ohio Loan & Trust Company, as secured by mortgage, and the rights and claims of certain mechanics and material men who furnished material and performed labor in the construction of the building.

The question in the case presented to us is, whether The Southern Ohio Loan & Trust Company, called the loan com-

pany for convenience, should be required to advance a balance of $1,500 still remaining unpaid on the mortgage of $4,500 which was given by Britton W. Griggs to the loan company to secure a loan for that amount. The claim of the loan company is that they were defrauded by Mr. Griggs at the time of the loan; that he misrepresented the value of the property, the title to the property, and, further, that the building was not completed according to contract; that they advanced $3,000 and that that is all that they should be required to advance upon this mortgage by reason of these misrepresentations.

The claim of the mechanics and material men—for the controversy is between the loan company and the mechanics and material men—is, that under the equities of the case, the loan company should be required and are required to advance the full amount of the mortgage; and further, that after the building was partially completed, it being apparent that there was not sufficient on hand of the money advanced under this loan to finish the building and to pay for the work and labor, that the loan company agreed with the mechanics and material men, in consideration of their releasing their mechanics' liens, that the loan company would advance the balance of the mortgage, then about $1,500—it was in fact $1,700, but there is only $1,500 in controversy—and that the balance of the mortgage should be distributed among the mechanics and material men; and the mechanics and material men claim that by reason of that contract, which they claim was made with the agent of the company, Mr. H. H. Barber, they proceeded with the construction of this building and finished it. Having finished it, the loan company refused to advance the balance of the money, and action was commenced by Mr. McMullen, as receiver for Hyter & Company, the holder of one of the liens, to foreclose the liens, and all the interested persons were made parties.

The general office of the loan company was in Cincinnati, and H. H. Barber was the agent of the company, at least for certain purposes, in the city of Toledo. He had admitted authority to solicit loans, and to collect assessments, fines, dues, examine property, appoint appraisers of property, and exercise some other authority. His appointment was in writing and makes

him the agent of the company. It reads:

"This is to certify that H. H. Barber, the bearer hereof, has this 26th day of June, 1899, been appointed local agent of The Southern Ohio Loan & Trust Company, for Toledo, Ohio, and is hereby duly empowered to solicit subscriptions to the capital stock and collect the membership fee therefor."

Signed by the president and M. S. Todd, secretary.

Britton W. Griggs was the owner, as has been said, of this property. He had negotiated a loan with Irish & Company for $2,500. In fact, he purchased the lot through Irish & Company for a consideration of $1,500 and executed a mortgage thereon for $2,500. They loaned him $1,000 above the purchase price with which he began the construction of this building.

This money being insufficient, in November, 1899, he called upon Mr. Barber, the agent of the loan company in Toledo, and finally made written application to the loan company for a loan of $5,000. This application was rejected; or, at least, one was sent on in its place for $4,500, which he filled out. In that application he represented that the cash value of the lot was $1,600, and that with the improvements when they were completed, the value would be $9,000, and signed answers to various other questions which were printed in the application. This was sent on, and his loan for $4,500 was allowed, and a mortgage was executed pursuant thereto, and sent on to the company. As a part of this application, there was an appraisers' report which was made by appraisers appointed by Mr. Barber, and sworn by him as notary. The appraisers appraised the lot at $900 instead of $1,600, and the buildings and improvements, when completed, at $5,000 instead of $7,400, the amount named in the application, which preceded this appraisement, and was on the same piece of paper. All of this went to the company, the owner's estimate of the property and the estimate put on it by the appraisers. It is claimed that this was such a misrepresentation on the part of Mr. Griggs as would invalidate the mortgage contract or relieve the company at least from advancing the amount they had agreed to advance. It was further claimed that Griggs represented he was the owner of the

property and sole owner; but that in fact Mr. Swinehart had an equity in the property and that that representation was therefore false, and that the company relied upon these representations in making the loan, and that therefore they are relieved from advancing the full amount of the mortgage, and it is claimed that the mechanics and material men who did work upon the building and furnished the material can have no greater rights than Griggs.

If the company had relied entirely upon the representations of Mr. Griggs, the case would stand differently from what it does. But it appears, instead of relying upon his statement, they required Mr. Barber to appoint three appraisers, who, in his judgment, would be competent to appraise this property; and that they did appraise it, and placed a value upon it considerably lower than the value fixed upon it by Mr. Griggs; that Barber himself examined the property at the time the company agreed to make this loan of $4,500; they had before them the information afforded by this appraisement by appraisers that were appointed by their own agent in the city of Toledo. So it is very clear that they did not rely and did not intend to rely wholly upon the representations that were made by Mr. Griggs. If they did not rely upon them, but sought information elsewhere, they were not prejudiced by the value that he might put upon his property. And more than that, the testimony shows that before this loan was made, which was in February, Mr. Todd, the secretary and treasurer of the company, was in Toledo, and he also seems to have acted in the capacity of general manager of the company. He went out to this property and examined it himself, examined the lot; and the building at that time was well along toward completion, and he examined that; and after an examination by this officer of the company the loan was made. So that the company not only had the judgment of the appraisers, but also the benefit of an examination by one of its officers.

The law is well settled that in matters of value, which are always to a great extent matters of opinion, if the purchaser, as you may call the mortgagee here, examines the property himself and has full opportunity to examine it, and is competent

and capable of judging of its value, so that no advantage of him is taken, that a statement by the seller that the property is worth more than it really is is not a fraudulent representation, or such a representation as would avoid a contract. The rule is often applied to personal property, and there is no reason why it should not be applied to real estate in a case where the facts are such as to admit of its application.

Here was a transaction where each party had an opportunity to examine and had sufficient knowledge and experience to form an opinion of his own. So that, so far as these representations, if there were any, as to value, are concerned, we think that they were not of such a character, under all of the circumstances, as would amount to a fraud or would vitiate or affect this mortgage. It appears that Griggs did probably put a high estimate on this property. He paid $1,500 for it however; but the agent through whom he bought it (there is some intimation at least of this) paid only $800, and that was regarded by the agent and his principal, perhaps, as the real value of the property. But Griggs had no knowledge of this arrangement, and he paid $1,500 for the property, and perhaps honestly thought it was worth about $1,500. At any rate, we find, under all the circumstances, there was no representation here that would affect this mortgage.

As to the title, Griggs represented that he was the sole owner of it. It appears by the testimony that Swinehart, his partner, had an equity in it. They were partners in the building business. But Griggs did have the sole legal title to the property, and so far the record disclosed, he was the sole owner. Swinehart makes no claim of any interest in it. So that if these representations of Griggs were not exactly true, it worked no prejudice to the loan company.

The mortgage was sent on, and on February 6, 1900, the loan company, through Mr. Todd, forwarded $3,000 to Mr. Barber, and with it a blank waiver of liens to be signed by all persons having liens upon the property. This waiver of liens apparently was filled out in the office of the company before being sent here. It is a printed blank filled out. And with the check for $3,000 was sent a letter of instructions to Barber to have the

enclosed waiver of liens signed by the persons having furnished
labor or material. It was apparent that $3,000 would not finish
the building. The material men and mechanics concluded they
were liable to lose at least a portion of what they had put in
the building. They had various meetings and discussed matters
and talked of discounting their claims, and finally, on February
17, they met Mr. Barber at his office, and all of them signed a
waiver of liens that had been sent on by the company, in con-
sideration of the company agreeing that the balance still coming
upon the mortgage, $1,724.50, would be advanced—the amount
in dispute, as stated, really being only $1,500, there being no
controversy that the rest was advanced, bringing it up to $3,000.
And in the waiver which they signed they postponed their
claims to that of the loan company, and their priority to the
mortgage of the loan company. The waiver contained this lan-
guage:

"In consideration of one dollar paid to each of them sev-
erally by The Southern Ohio Loan & Trust Company, the re-
ceipt whereof is hereby acknowledged, and in further consid-
eration of a loan of $4,500 granted by the said The Southern
Ohio Loan & Trust Company to the said Barton W. Griggs, and
secured by mortgage upon said premises, do hereby respectively
postpone to the said The Southern Ohio Loan & Trust Company
any priority which they may have or might otherwise obtain by
mechanics' lien, or other similar liens upon said premises."

The waiver itself contained a recital and statement that this
was done in consideration of this loan of $4,500, and the original
agreement and arrangement between the loan company and
Griggs was that this money was to be used in the construction
of this building; and upon a written order signed by Mr. Griggs,
it was all to be sent to Mr. Barber, who was to distribute it
among the persons entitled to it; the loan company accepting
this order, which is as follows:

"THE SOUTHERN OHIO LOAN & TRUST COMPANY:

"I hereby authorize you to pay the proceeds of my loan of
$4,500 made in accordance with my application, bearing date

the —— day of ————, 189—, as stated below, and this shall be your receipt therefor.

"$4,500 to H. H. Barber.

"(Signed)    BRITTON W. GRIGGS.

"Witness:  A. F. SWINEHART."

So that the arrangement and understanding between Griggs and the loan company was that this money was to be used to complete this building, and that it was to be held by the company, or by its agent, and distributed by him to those who performed labor or furnished material for the building. It was not to go into Griggs' hands at all unless there was some surplus. And the $1,500 being held back, in consideration of the company loaning the full amount of $4,500, the lienholders, the mechanics and material men who were entitled to liens signed this waiver, and the company accepted it.

But besides that, Mr. Barber signed the following paper on the same day, and as a part of the same transaction:

"TOLEDO, OHIO, February 17, 1900.

"The Southern Ohio Loan & Trust Company, in consideration of the waiver of certain rights and priorities on the part of certain persons and firms who have performed labor and furnished materials for the erection of a building upon the following real estate, viz., the west twenty-four feet of lot 2 and the east twelve feet of lot 3 in Spaulding's addition to Toledo, Lucas county, Ohio, hereby undertakes and agrees that after the payment of claims and liens which have priority over the claims and liens of such persons and firms signing such waivers, it will retain in the hands of its agent the balance of the fund arising from its loan and mortgage upon said real estate to be paid out from time to time upon and for construction and completion of said building, insurance upon the same and at least one month's dues. Said company represents that said balance will be the sum of $1,724.50, provided that the claims as presented and included in this settlement include all the claims that can become a lien upon said real estate.

"(Signed)   H. H. BARBER,

"*Agent and Local Treasurer of The Southern Ohio Loan & Trust Co.*"

So that if Mr. Barber was authorized to act for the company in this matter, here was beyond question a contract between the

company and the lien holders that could be enforced; that on the one hand, the company would advance the balance of $4,500, and on the other hand, the lien holders would waive their liens, the money to be held by the company or its agent and paid to the lien holders according to their rights and claims.  But it is claimed that Mr. Barber had no authority to make this contract, and therefore that it was not binding upon the company. He had theretofore been appointed the agent of the company. He had authority to solicit loans for the company, collect fines and dues, and appraise property, and to do everything necessary to make a loan for the advantage and purposes of the company.  He received his compensation, or most of it, at least, in the way of commissions from those who borrowed money from the loan company, but so far as is disclosed here, he was not the representative of the borrower in any respect.  It was not his duty to protect the borrower or his interest in any manner.  He did nothing for the borrower except to take his application and send it to the company, and take the necessary steps to protect the company if a loan was to be made.  At the time this contract was made, there had been no intimation on the part of the company that the full amount of $4,500 would not be advanced.  The amount spoken of in the waiver of liens which was sent on by the company to Mr. Barber to have the lien holders sign is $4,500, and no question was made by them or by any one but that the full amount would be advanced.  In sending on the $3,000, in their letter, they say: "We enclose check for the sum of $3,000 on account of loan 4364, Britton W. Griggs."  It is *on account* of that loan.  It was usual for them to withhold a portion of the amount until the building was finished.  After these contracts had been signed, in the following April, Mr. Barber wrote the company quite a long letter, going somewhat into details as to the matter of the waiver of liens.  The date of the letter is April 24, 1900.  He says, among other things:

"As claims for labor and material were brought in, it became evident that your loan, even the whole $4,500, would not be sufficient to pay the bills, and Hyter & Co. having the largest unsecured claim, and having confidence in the property, desired to see the property completed and the loan made as contem-

plated.   They called a meeting of the creditors and obtained
from all some concessions on their claims, and then took the
title from Mr. Griggs and undertook to finish the building ac-
cording to the plans and specifications.   Mr. McMullen, who
holds the legal title, is the manager of The Hyter Lumber Com-
pany.   When everything was adjusted and first liens would be
paid and waivers of liens obtained, I paid first liens and labor
claims on the basis agreed upon among the creditors, and I have
distributed all of the $3,000 that you sent.''

Then he says further along:

''Before sending my report I went to Mr. McMullen and pre-
sented the bill for arrearages.   He said it was all right and
would be paid, but remarked that the building was just about
finished, and that, considering what they already had in the
building, they would like to get their share of the $1,500 before
paying the bill for arrearages.   I told him you were anxious to
have the account paid, and he made the remark that you ought
not to feel very bad about it, as you then had in your possession
$1,500, most of which, with the building so near completion,
belongs to the Hyter Co.''

On the same day Mr. McMullen wrote to the loan company,
among other things:

''The building in question is only this day finished.   Delayed
by bad weather, etc.   You have $1,500 yet in your hands, and
out of this amount Mr. Barber, your agent, advised me you
would hold your first and probably second payment.''

The company previous to that had written to Mr. McMullen
to pay the dues on the loan as follows:

''We are advised that you are the owner of the property se-
curing loan No. 4364, Britton W. Griggs, and beg to advise you
that unless arrearages on this loan are paid by the 26th inst.,
suit in foreclosure of the mortgage will be filed.''

That bears date of April 23, 1900, and in the letter by Mr.
McMullen of April 24 he refers to the receipt of this letter.

After receiving McMullen's letter of April 24, the company,
through Mr. Todd, under date of April 26, wrote McMullen:

''If you are the owner of property securing loan No. 4364,
Britton W. Griggs, it would be proper for you to pay up ar-
rearages on the loan, which for this month amounts to $85.16.

Another payment will be due May 5. The matter of closing the loan will receive due attention when arrearages have been paid on amounts already advanced."

This was the answer to his letter of April 24, in which he stated to the company there was $1,500 coming, and they say "the matter of closing the loan will receive due attention when arrearages have been paid."

McMullen then sent on his check for $85.16, and subsequently sent on a check for one month's dues, $32.50, which latter was the full amount due on the loan of $4,500. This was accepted by the company, and they requested him to pay all arrearages as they became due.

It appears from this correspondence that the company were fully advised of what had been done by Mr. Barber and of the arrangement that had been made as to the liens that had been waived, and of the agreement that had been made, and the understanding there was that the company would advance the balance of this amount, and we think that what Barber did was fully ratified in any event by the loan company.

But we are of the opinion that the arrangement that Mr. Barber made was within the scope of his agent and authority. He had power and authority to negotiate this loan, and to make collections, and power to protect the interests of the company in all proper matters pertaining to the loan. At the time this arrangement was made, there had been no suggestion on the part of the company that the full amount would not be advanced. And in making this arrangement he was simply protecting the interests of the company and making arrangements whereby this loan could be made, which was the company's business— their business being to make loans, and whereby their interests would be protected, and their mortgage claim put ahead of the claims of the mechanics and material men—and by virtue of this arrangement, and relying upon the action of the agent of this company, the mechanics and material men waived their liens, and it seems to us that it would be unjust and inequitable for the court to hold, under these circumstances, that the mortgage of the loan company should have priority over the claims of the mechanics and material men who finished this building.

We are of the opinion, as already stated, that the representations of Mr. Griggs as to the value of this property were not of such a character as to vitiate or affect the mortgage. But if they were, they would not affect the rights of the mechanics and the material men. If there were any fraudulent or false representations on the part of Griggs, in his application for the loan, they were not a party to them, had no hand in them and no knowledge of them, and therefore were not affected by them; but the loan company, after they had examined the property, and after a month or more had gone by from the time that the loan was agreed upon, and with full knowledge of all the material facts or with opportunity to secure full knowledge, through its agent, made this contract with the mechanics and material men, and by virtue of the agreement of the loan company, and by reason of its agreement that it would advance the balance of the money due upon this mortgage, they released their liens for their labor and their material. We are of the opinion that they would not be deprived of their rights under this contract made with the company even if Griggs' representations were false and fraudulent in law to the extent claimed by the company.

We have reached the same conclusion in this case that was reached by the judge who tried the case in the common pleas court. We think that the mechanics and material men are entitled to priority over the loan company to the extent of $1,500, the balance due upon the mortgage, if that amount is necessary to satisfy their claims. The same decree should be entered here that was entered in the court below.

Mr. Brumback: "May I inquire if your honors considered the question of subrogation?"

Judge Hull: "Yes, we considered the question of subrogation; $2,500 of this $3,000 advanced having been used to pay off the Irish mortgage, the loan company would be entitled to be subrogated to that amount; but the $1,500, which was the balance of the mortgage, and which the loan company agreed to advance, but did not, was a matter that came after and in addition to the paying off of the Irish mortgage. If the loan company had put into Mr. Barber's hands the $1,500, which was agreed to be distributed among the mechanics and material men,

then you would be entitled to be subrogated to the amount of the Irish mortgage and would be entitled to the first lien to the amount of $3,000. The mechanics and material men have the first lien then to the amount of $1,500, the balance due upon the mortgage. But the result is the same, whether it is figured out in that way, or whether the court decrees that the mechanics and material men have the first lien for $1,500 as against the mortgage loan for $3,000, which the loan company now holds. Carrying out the views of the court in your way simply requires the loan company to pay into Mr. Barber's hands $1,500 to be distributed according to the agreement and arrangement which we hold was made.''

Mr. Emery: ''Will your honor dispose of the interest on this $1,500 from the time the building was finished and it should have been paid?''

Judge Hull: We had not considered that, but the money, not having been paid when the building was finished, you are entitled to interest upon it from that time.''

Mr. Brumback: ''There should be some consideration paid to these dues and premiums which should have been kept up all the time.''

Judge Hull: ''Yes, up to the time the building was completed when the money was due, you can compute that and arrive at the difference. You should have credit for the dues and arrearages, which should have been paid up to that time.''

*Ralph Emery* and *B. F. Brough,* for plaintiff.

*O. S. Brumbach,* for Southern Ohio Loan & Trust Company.

*Fluckey & Garver,* for Jacob Cook and Ruth A. Arnold, executrix.

*T. L. Gifford,* for Wolf & Warnke.